**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, et al<br><br>Plaintiffs,<br><br>v.<br><br>L.P.C.&D., INC., et al<br><br>Defendants. | CIVIL NO.: 24-1538 (RAM) |

**REPORT AND RECOMMENDATION**

## I.    PROCEDURAL BACKGROUND

On November 19, 2024, Plaintiffs Zurich American Insurance Company ("Zurich"), Fidelity and Deposit Company of Maryland ("F&D"), XL Specialty Insurance Company ("XLS") and XL Reinsurance America, Inc. ("XLR") (collectively, "Plaintiffs" or "Sureties") filed suit against Defendants L.P.C.&D., Inc. ("LPCD"), Las Piedras Construction Corp. ("Las Piedras"), Tejo, Inc. ("Tejo"), Equipment Depot, Inc. ("EDI"), Kane Caribbean, Inc. ("KCI"), Piezas Extras, Inc. ("PEI"), Equipos de Boquerón, Inc. ("EBI"), Caribbean Raceway Park, Inc. ("CRP"), Hacienda Cuco, Inc. ("HCI"), and Pedro Feliciano Benítez ("Feliciano") (collectively, "Defendants" or "Indemnitors"). Plaintiffs bring forth six causes of action against Indemnitors, including breach of contract, specific performance, indemnity pursuant to the Puerto Rico Civil Code of 1930, 31 L.P.R.A. §§ 4911, 4916, and 3023, exoneration, and quia timet, as well as common law indemnity against LPCD. ECF No. 1. This lawsuit arises out of two indemnity agreements that Defendants executed with Plaintiffs, in order to secure payment and performance

bonds for a construction project in Puerto Rico. ECF No. 1. Upon LPCD's failure to pay one of its subcontractors, Soletanche, Inc., the latter filed suit (the "Soletanche Litigation") in the Court of First Instance, San Juan Part ("CFI") against LPCD, the Sureties, and the Puerto Rico Aqueduct and Sewer Authority ("PRASA"). ECF No. 49 at ¶ 17. Judgment, modifying the CFI Judgment, was eventually entered by the Court of Appeals of Puerto Rico against LPCD and the Sureties for $2,676,471.31, excluding interests and other amounts not yet calculated in the litigation. Exhibit 9-t.

Before the Court now is Plaintiffs' motion to compel (ECF No. 2), whereby they request that the Court grant injunctive relief against Defendants, order them to deposit collateral with Zurich in the amount of five million six hundred thousand dollars ($5,600,000.00) and give Plaintiffs access to Defendants' books, records, and accounts. ECF No. 2.[1] Also before the Court are Defendants' opposition and motion in compliance (ECF Nos. 25 and 26)[2], alleging *Colorado River* abstention, and Plaintiffs' corresponding reply (ECF No. 29), as well as Defendants' motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") (ECF No. 48) and Plaintiffs' opposition thereto. ECF No. 51. An evidentiary hearing regarding the request for injunctive relief was held on August 20, 2025. ECF No. 58. For the following reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction should be DENIED, Defendants' request for the Court to abstain under *Colorado River* should also be DENIED, and Plaintiffs' motion to compel should likewise be DENIED.

---

[1] Plaintiffs have steadfastly maintained their position that at this moment they are not seeking from the Sureties payment or indemnification, but rather collateralization.
[2] Despite being docketed under different titles, both the motion filed at ECF No. 25 and the motion filed at ECF No. 26 are alike. This being the case, the Court will simply refer to the motions them jointly as Defendants' opposition.

## II.    FINDINGS OF FACT[3]

LPCD is a general contractor that required surety performance and payment bonds on various construction projects. ECF No. 49 at ¶ 1. Zurich and XLS are surety companies in the business of providing performance and payment bonds to companies for various projects, including construction projects. ECF No. 1 at p. 3, ¶ 17; ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 29:49-29:55, 2:03:24-2:03:39. F&D and XLR are wholly owned subsidiaries of Zurich and XLS, respectively. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 28:25-28:42, 2:01:58-2:02:11. On May 24, 2004, the Indemnitors each executed a General Agreement of Indemnity with Zurich and F&D (the "Zurich GAI"), and on June 18, 2004, the Indemnitors each executed a General Agreement of Indemnity with XLS and XLR (the "XL GAI") (collectively, the "Indemnity Agreements"). ECF No. 49 at ¶ 2. Per the Zurich GAI, Defendants agreed, in relevant part, to the following:

> The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interests, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety, the Contractor and Indemnitors further agree that in any accounting between the Surety and Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers

---

[3] The following findings of fact were obtained from the parties' joint "Motion Submitting Uncontested Material Facts" (ECF No. 49) as well as from the testimony and exhibits presented at the evidentiary hearing held on August 20, 2025. ECF No. 58.

or other evidence of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety.

Exhibit 4 at p. 1, cl.2; ECF No. 49 at ¶¶ 3-5. Defendants also agreed that: "[a]t any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Contractor, and Indemnitors. . . ." Exhibit 4 at p. 3, cl. 9; ECF No. 49 at ¶ 6.

Similarly, the parties in the XL GAI agreed that the indemnity agreement "shall be liberally construed so as to protect, exonerate, hold harmless, and indemnify" XLS and XLR. Exhibit 10 at p. 1, cl. II(E); ECF No. 49 at ¶ 7. Much like the Zurich GAI, the XL GAI binds the Indemnitors to various terms, including the following:[4]

> (A) UNDERSIGNED shall exonerate, hold harmless, indemnify, and keep indemnified SURETY from and against any and all losses, claims, liabilities, damages, demands for payment or performance, expenses and costs of whatsoever kind or nature including, but not limited to, interest, court costs, document reproduction and storage charges, investigative expenses and costs, adjusting expert and attorney fees imposed upon, sustained, or incurred by SURETY by reason of: (1) SURETY having executed, provided or procured BOND(S) in behalf of PRINCIPAL; (2) UNDERSIGNED's failure to perform or comply with any of the provisions of this AGREEMENT; (3) SURETY enforcing any of the covenants or conditions of this AGREEMENT; (4) SURETY conducting any investigation, obtaining or attempting to obtain a release, or recovering or attempting to recover loss or unpaid premium in connection with any BOND(S); and/or (5) SURETY prosecuting or defending any action or claim in connection with any BOND(S) executed provided or procured in behalf of PRINCIPAL, whether SURETY at its sole option elects to employ its own counsel, or permits or requires UNDERSIGNED to make arrangements for SURETY'S legal representation.

> (B) In order to exonerate, hold harmless and indemnify SURETY, UNDERSIGNED shall upon demand of SURETY deposit funds with SURETY before SURETY makes any payment; such funds shall be, at the SURETY'S option, money or property or liens on security interest in property. The amount of such money or property or the value of the property to become subject to liens or security interests shall, at the option of the SURETY, equal (1) the sum of all pending claims asserted against SURETY on BOND(S), whether such claims are

---

[4] The term UNDERSIGNED used in the XL GAI's language refers to Indemnitors, as defined in page 1 of this Report and Recommendation, whereas the term PRINCIPAL refers to LPCD, also as defined in page 1 of this Report and Recommendation.

contested or not or whether or not liability has been established with respect to such claims, plus the amount of costs and expenses which the SURETY, at its sole discretion, estimates may be incurred as a result of the assertion of such claims, or (2) the reserve established by SURETY as consequence of having issued BOND(S) in behalf of PRINCIPAL. SURETY shall have no obligation to invest or provide a return on the funds deposited.

Exhibit 10 at p. 2, cl. V(A)&(B); ECF No. 49 at ¶¶ 8-9. The last sentence of subsection (B) of this

clause, expressly states:

UNDERSIGNED acknowledge that failure of UNDERSIGNED to deposit funds with SURETY in accordance with this section in the amounts and at the time demanded by SURETY shall cause irreparable harm for which SURETY has no adequate remedy at law. UNDERSIGNED agree that SURETY shall be entitled to injunctive relief for specific performance of UNDERSIGNED'S obligation to deposit funds with SURETY in accordance with this section.

Exhibit 10 at p. 2, cl. V(B); ECF No. 49 at ¶ 14. Regarding liability, the XL GAI states, in part:

(B) The liability of UNDERSIGNED under this AGREEMENT shall extend to and include all amounts paid by SURETY in GOOD FAITH under the belief that: (1) SURETY is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; or (2) such payments were necessary or advisable to protect any of SURETY'S rights or to avoid or lessen SURETY'S liability or alleged liability.

. . .

(D) The voucher(s) or other evidence of such payment(s) or an itemized statement of payment(s) sworn to by an officer of SURETY shall be prima facie evidence of the fact and the extent of the liability of UNDERSIGNED to SURETY.

Exhibit 10 at p. 2, cl. VI(B)&(D); ECF No. 49 at ¶ 10. The XL GAI likewise provides that both

XLS and XLR "shall have access to the books, records, . . . and accounts of UNDERSIGNED. . ."

Exhibit 10 at p. 4, cl. XVI; ECF No. 49 at ¶ 11. Moreover, both the Zurich GAI and the XL GAI

contain provisions that benefit any co-sureties who also issue bonds in favor of Indemnitors.[5]

---

[5] The Zurich GAI provision states:

In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, then all the terms

On December 14, 2004, relying on the Indemnity Agreements and the Indemnitors' promises contained therein, and at the request of one or more of the Indemnitors, the Sureties issued payment and performance bonds naming LPCD as principal and PRASA as the obligee (the "Bonds"). ECF No. 49 at ¶ 16. These Bonds guaranteed LPCD's work pursuant to its contract with PRASA for the construction project known as Embalse del Río Naguabo, Puerto Rico (the "Project"), as per the award letter dated November 10, 2004, and guaranteed LPCD's obligations for payment to:

> [A]ll persons, firms, corporations who or which may furnish labor, or who furnish materials to perform as described under the [C]ontract and to their successors and assigns in the total aggregate penal sum of One Hundred Three Million Six Hundred Thirty-Two Thousand Two Hundred Seventy and 00/100 Dollars ($103,632,270.00) . . . .

Exhibit 3 at p. 1; ECF No. 49 at ¶ 16.

On December 26, 2006, Soletanche, Inc., one of LPCD's subcontractors on the Project, filed a claim against LPCD, the Sureties, PRASA, and others in the Court of First Instance in San Juan, Puerto Rico, implicating the Bonds issued for the Project. ECF No. 49 at ¶ 17. Following over 12 years of litigation,[6] on May 6, 2019, the CFI entered judgment in the Soletanche Litigation against LPCD and the Sureties (the "CFI Judgment"). ECF No. 49 at ¶ 18. After multiple appeals were filed challenging the CFI Judgment, on June 30, 2023, the Court of Appeals of Puerto Rico

---

and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

Exhibit 4 at p. 3, cl. 14; ECF No. 49 at ¶ 12. By the same token, the XL GAI provision states:

> (D) This AGREEMENT inures to the benefit of any co-surety or reinsurer of SURETY on BOND(S), and in the event the SURETY procures the execution of BOND(S) by other sureties, this AGREEMENT shall inure to the benefit of such other sureties.

Exhibit 10 at p. 1, cl. II(D); ECF No. 49 at ¶ 13.

[6] During the course of the Soletanche Litigation, three of the Defendants were dissolved: EBI, PEI, and CRP. Exhibits A, B, and C.

entered the following judgment (the "Appellate Judgment"), modifying the CFI Judgment in favor

of Soletanche, Inc., and against LPCD and the Sureties:

> Soletanche will receive the following compensation from LPC&D and its sureties: payment of the value of the columns within the work platform built and not paid, $770,241.08, change of criteria in the installation, maximum amperage $1,249,630.00 and for the stoppage for incorrectly rejecting the compacted sand in the stone columns $314,777.50 for a total of $2,334,648.58. The CFI will determine the payment of interest in accordance with the subcontract signed by Soletanche and LPC&D.

Exhibit 5-t at pp. 69-70; ECF No. 49 at ¶¶ 19-20.

On March 8, 2024, the Supreme Court of Puerto Rico entered a resolution affirming the

Appellate Judgment. Exhibit 6-t; ECF No. 49 at ¶ 21. Thus, the case was remanded to the CFI to

determine the interest applicable and to adjudicate the final liability of LPCD and the Sureties.

ECF No. 49 at ¶ 22. The Sureties subsequently sent Defendants a demand letter on July 1, 2024,

whereby they demanded that the Indemnitors indemnify, exonerate, and collateralize the Sureties.

ECF No. 49 at ¶23; Exhibit 1. Almost three months later, on September 26, 2024, Soletanche, Inc.

filed a motion for writ of execution of judgment, seeking that the CFI (1) set a schedule for the

determination of interests and entry of final judgment, and (2) immediately enter judgment against

the Sureties in the amount of $2,676,471.31, exclusive of interest and additional amounts that are

pending determination by the CFI. ECF No. 49 at ¶ 24; Exhibit 8-t. The CFI granted Soletanche,

Inc.'s motion on June 23, 2025, giving Soletanche, Inc. five days to tender a draft order for

execution of judgment and a writ of mandamus. Exhibit 9-t.[7]

---

[7] On December 5, 2025, Plaintiffs informed the Court that on September 19, 2025, Soletanche Inc. filed a motion in the CFI notifying that on August 21, 2025, it had tendered a proposed order and writ of execution. ECF No. 61 at 2, ¶ 3-4. However, as of the filing of this Report and Recommendation, the parties have not brought to the Court's attention whether the CFI has issued any order and writ of execution of judgment.

## III.    RULE 12(B)(1) MOTION (ECF NO. 48)

### A. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) requires the Court to "construe the [c]omplaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." *Murphy v. U.S.*, 45 F.3d 520, 522 (1st Cir. 1995) (citing *K.W. Thompson Tool Co. v. United States*, 836 F.2d 721, 726 (1st Cir. 1988)) (emphasis in the original). However, the court may also "consider materials outside the pleadings" when analyzing Rule 12(b)(1) motions. *González v. U.S.*, 284 F.3d 281, 288 (1st Cir. 2002 (citing *Heinrich v. Sweet*, 44 F.Supp.2d 408, 412 (D. Mass. 1999); *White v. Comm'r of Internal Revenue*, 899 F.Supp. 767, 771 (D. Mass 1995)); *see also Fernández Molinary v. Industrias La Famosa, Inc.*, 203 F.Supp.2d 111, 114 (D.P.R. 2002) ("[U]nder Rule 12(b)(1) the Court is not restricted to the face of the pleadings but may consider extra-pleading materials, such as affidavits and testimony to resolve factual disputes concerning the existence of jurisdiction.") (citations omitted).

Challenges to a court's federal subject matter jurisdiction pursuant to Rule 12 (b)(1) include issues such as "sovereign immunity, mootness, [and] ripeness . . . ." *González-Camacho v. Banco Popular de Puerto Rico*, 318 F.Supp.3d 461, 469 (D.P.R. 2018) (citing *Valentín v. Hospital Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001)). Though the burden of proving jurisdiction rests with the plaintiff, dismissal is not warranted under 12(b)(1), "unless it is clear that plaintiff will be unable to prove any set of facts which would entitle [it] to recovery." *Great River Indus., Inc. v. Public Serv. Com'n of Puerto Rico*, 131 F.Supp.2d 265, 268 (D.P.R. 2001) (collecting cases). "Federal jurisdiction is never presumed. Instead, the proponent—here, the plaintiff[]—must carry the burden of demonstrating the existence of federal jurisdiction." *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998) (citing *Aversa v. United States*, 99 F.3d 1200, 129 (1st Cir. 1996); *Murphy*,

45 F.3d at 522 (1st Cir. 1995)). The plaintiff "may not rest merely on 'unsupported conclusions or interpretations of law.'" *Great River Ind., Inc.*, 131 F.Supp.2d at 269 (quoting *Washington Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993)). "Subjective characterizations or conclusory descriptions of a general scenario which *could* be dominated by unpleaded facts' will not defeat a motion to dismiss." *Murphy*, 45 F.3d at 522 (quoting *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992)).

### B. Analysis

In their motion to dismiss, Defendants contend that Plaintiffs' request for preliminary injunction should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). ECF No. 48 at 5.[8] Specifically, Defendants claim that Plaintiffs' case is unripe because the Soletanche Litigation Appellate Judgment amount does not include the total amount of attorney fees, penalties nor interest owed. *Id*; ECF No. 2-4 at 70; Exhibit 5-t at 70. As such, Defendants claim that the Soletanche Litigation has not ended, therefore depriving this Court from asserting subject matter jurisdiction over the federal case. *Id*. at 7. Plaintiffs oppose this contention, arguing that the existence of "not only a judicial demand for payment against the Sureties but [also] a Court judgment ordering [LPCD] and the Sureties to make payments on a claim made by a subcontractor of [LPCD]" entitles Plaintiffs, under Puerto Rico law, to demand collateral agreed upon in their Indemnity Agreements. ECF No. 51 at 9. Plaintiffs' position is correct.

For starters, and unlike Defendants state in their motion to dismiss (ECF No. 48 at 6), "[t]he ripeness of indemnification claims is a question of federal law." *Kelly v. Riverside Partners, LLC*,

---

[8] Defendants also base their motion to dismiss on Plaintiffs' failure to comply with Local Rule 65. Local Rule 65 states that "[a]ny motion for a temporary restraining order or preliminary injunction shall be accompanied by a proposed order." Plaintiffs did not include any such proposed order with their motion to compel. ECF No. 2. While, it is important that the parties comply with the strictures of the local rules and they ignore these rules at their own peril, *Nieves Ayala v. Johnson & Johnson, Inc.*, 208 F.Supp.2d 195, 198 (D.P.R. 2002), dismissal on this ground alone would be too drastic a measure.

964 F.3d 107, 115 (1st Cir. 2020)). The ripeness doctrine "'has roots in both the Article III case or controversy requirement and in prudential considerations.'" *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 8 (1st Cir. 2012) (quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003)).  A court deciding the ripeness issue under Rule 12(b)(1), "must take the complaint's well-pleaded facts as true and indulge all reasonable inferences in its favor." *Project Veritas Action Fund v. Conley*, 270 F.Supp.3d 337, 340 (D. Mass. 2017). Determining the ripeness analysis necessarily turns on "two factors: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Sindicato Puertorriqueño*, 699 F.3d at 8 (quoting *Abbott Labs. Gardner*, 387 U.S. 136, 149 (1967), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)); *see also Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) ("Ripeness analysis has two prongs: 'fitness' and 'hardship.'") (quoting *Texas v. U.S.*, 523 U.S. 296, 300-01 (1998)).

The first prong of the ripeness analysis, that is the fitness prong, involves "both jurisdictional and prudential components." *Reddy*, 845 F.3d at 501 (quoting *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)). "The jurisdictional component of the fitness prong concerns 'whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts.'" *Id*. On the other hand, "[t]he prudential component of the fitness prong concerns 'whether resolution of the dispute should be postponed in the name of judicial restraint from unnecessary decision of constitutional issues.'" *Id*. (internal citations and quotations omitted). Thus, "if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision." *Mangual*, 317 F.3d at 59.

As for the hardship prong, this prong is "'wholly prudential.'" *Id*. (citing 1 L. Tribe, *American Constitutional Law* § 3d ed. 2000)). It "requires a court to consider 'whether the

challenged action creates a direct and immediate dilemma for the parties.'" *Sindicato Puertorriqueño*, 699 F.3d at 9 (quoting *Verizon New Eng., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011)) (internal citations and quotations omitted). In this regard, the "'mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.'" *Id.* (quoting *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003)).

Here, the jurisdictional component of the fitness prong is met. The merits of the Soletanche Litigation have been adjudicated and liability has already been attributed to LPCD and the Sureties in the amount of $2,676,471.31, excluding the interest, attorney fees, and penalties which have yet to be calculated. ECF No. 2-4 at 69-70; Exhibit 5-t at 69-70. What is more, Soletanche, Inc. has already requested, and the CFI has granted, the issuance of a writ of execution of this judgment,[9] and Soletanche, Inc. has tendered a proposed order and writ of execution, which is pending before the CFI. ECF No. 61.

Defendants agreed that, "[p]ayment . . . shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor." ECF No. 2-1 at p. 1, cl. 2; Exhibit 4 at p. 1, cl. 2. Defendants also agreed that "[i]n order to exonerate, hold harmless and indemnify [Sureties], [Indemnitors] shall upon demand of [Sureties] deposit funds with [Sureties] before [Sureties] make[] any payment . . . ." *Id*; *see also* ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 1:50:57-1:51:30. Accordingly, Plaintiffs' request for preliminary injunctive relief is premised upon Defendants' failure to comply with their agreed-upon obligations to *inter alia* collateralize Plaintiffs in view of the over two-million-dollar judgment amount Sureties are liable for in the Soletanche Litigation. ECF No. 2 at 10, 24. In other words, Plaintiffs are not bringing forth a hypothetical claim, but

---

[9] Exhibit 9-t.

rather a live claim where the facts clearly show that liability has been adjudicated and payment is not a speculative concern. *See* 31 L.P.R.A. § 4916 (1930) ("The surety, even before paying, may proceed against the principal debtor: (1) [w]hen he is sued for the payment. . . ."); *see also Am. Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 301 (2d Cir. 1989) ("In assessing whether [the surety's] cause of action for collateral security is ripe, the relevant question is not whether [the surety] actually paid . . . or whether [its] liability . . . is established with finality or certainty. Rather, the relevant question . . . is whether the 'demands' . . . have been made."); *cf. Reddy v. Foster*, 845 F.3d at 505 (finding that the case was not ripe because, among other things, the court had before it "'only hypothetical . . . claims, the details of which are not known.'") (quoting *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 328 (1st Cir. 2016)).

The prudential component of the fitness prong is likewise met. The final dollar amount that LPCD and the Sureties will have to pay once interest, penalties, and attorney fees have been taken into account will not "significantly affect" Plaintiffs' claims, as the legal issues in this case are predicated on Defendants' alleged failure to comply with the terms of the Indemnity Agreements, not the determination of the liability amount. *See Algonquin Gas Transmission, LLC v. Weymouth, Mass.*, 919 F.3d 54, 62 (1st Cir. 2019) ("The prudential component of the fitness test asks whether the resolution of the case turns on 'legal issues not likely to be significantly affected by further factual development.'") (citing *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)). In the same vein, Defendants' alleged noncompliance with the Indemnity Agreements' terms indeed presents a "direct and immediate dilemma," to the Plaintiffs that satisfies the hardship prong. *Roman Catholic Bishop of Springfield*, 724 F.3d at 92-93. Plaintiffs face the imminent threat of execution of judgment in the Soletanche Litigation, which in turn,

would obligate them to tap into their own coffers to pay no less than the Appellate Judgment amount, contrary to the terms of the Indemnity Agreements.

Accordingly, Defendants' motion to dismiss under Rule 12(b)(1) should be DENIED. ECF No. 48.

## IV.  *COLORADO RIVER* ABSTENTION DOCTRINE (ECF NOS. 25-26)

### A.  Applicable Legal Standard

The *Colorado River* abstention doctrine has its genesis in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), a water rights case wherein the district court dismissed the case, stating that the doctrine of abstention precluded it from entertaining the federal proceeding due to the existence of a parallel state court proceeding. *Id.* at 806. In reversing the lower court, the Supreme Court explained that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 813. It further explained that "[t]he doctrine of abstention, under the which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.*

The First Circuit, in recognizing the exceptional quality of *Colorado River* abstention, has consistently held that its applicability is quite limited. *Río Grande Comty. Health Center, Inc. v. Rullán*, 397 F.3d 56, 71 (1st Cir. 2005) (quoting *Colorado River*, 424 U.S. at 818; s*ee also Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 27 (1st Cir. 2010) ("The crevice in federal jurisdiction that *Colorado River* carved is a narrow one. Of all the abstention doctrines, it is to be approached with the most caution, with "[o]nly the clearest of justifications" warranting dismissal.") (citing *Colorado River*, 424 U.S. at 819); *Currie v. Group Ins. Com'n*, 290 F.3d 1, 9 (1st Cir. 2002) ("'[T]he circumstances permitting the dismissal of a federal suit due to the presence of a concurrent

state proceeding for reasons of wise judicial administration are considerably more limited that the circumstances appropriate for abstention' and should be 'exceptional' to justify deferral to the state court.") (quoting *Colorado River*, 424 U.S. at 818).

To this end, the First Circuit has extrapolated a non-exclusive list of factors, known as the "exceptional-circumstances test," in order to determine whether *Colorado River* abstention is warranted, to wit:

> (1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*KPS & Assoc., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003) (citing *Burns v. Watler*, 931 F.2d 140, 146 (1st Cir. 1991)); *Jiménez*, 597 F.3d at 27-28 (quoting *Río Grande Cmty. Health Center, Inc.*, 397 F.3d at 71-72). "No one factor is meant to be determinative, but rather courts must make a 'carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise.'" *Río Grande Cmty. Health Center, Inc.*, 397 F.3d at 72 (quoting *Colorado River*, 424 U.S. at 818; *Moses H. Cone Mem'l. Hosp.*, 460 U.S. at 16; *KPS & Assoc.*, 318 F.3d at 10). Moreover, "'district court[s] must approach [their] decision 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 12 (1st Cir. 1990) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

## B. Analysis

In their opposition to Plaintiffs' motion to compel, Defendants argue that the Court should not grant Plaintiffs' request for injunctive relief because the Soletanche Litigation, which was filed in state court prior to the birth of this case, constitutes parallel litigation that activates the *Colorado*

*River* abstention doctrine. ECF No. 25 and 26. In Defendants' view, "there is a clear identical involvement of the same matter [because] both the state court's litigation and this case are about the the [*sic*] bonds for the 'Project.'" *Id*. at 4. Focusing specifically on two of the factors courts must consider under the doctrine—that is "the desirability of avoiding piecemeal litigation" and "the order in which the forums obtained jurisdiction"—Defendants request that the Court defer jurisdiction to the proceedings in the CFI and dismiss Plaintiffs' motion to compel in its entirety. *Id*. Plaintiffs' replied, arguing that *Colorado River* does not apply to this case because the state and federal cases are not parallel, as each case involves different claims and the federal case involves a potentially broader scope of relief. ECF No. 29 at 3-4. Plaintiffs also argue that were the Court to find that the cases are parallel, abstention is still inappropriate as there exist no exceptional circumstances that warrant abstention. *Id*. at 5-11.

As previously stated, *Colorado River* abstention necessarily requires the Court to first determine whether the state court proceeding and the federal proceeding are parallel. *Alexandrino v. Jardín de Oro, Inc.*, 573 F.Supp.2d 465, 473 (D.P.R. 2008) (citing *Pastor-Ginorio v. R&G Mortg. Corp.*, 371 F.Supp.2d 89, 95 (D.P.R. 2005)). Only after this determination does the Court then go on to "perform a balance of interests considering [the six factors listed above] in order to determine whether there exist 'exceptional circumstances' to justify abstention." *Id*. at 474. Cases are considered parallel "if they involve the same parties and 'substantially identical claims,' raising 'nearly identical allegations and issues.'" *Id*. at 473-74 (quoting *Timoney v. Upper Merion Twp.*, 66 Fed.Appx. 403 (3rd Cir. 2003)).

In this case, the first part of the analysis militates against abstention, as the parties and the issues are not parallel. The state court case involves Soletanche, Inc., a subcontractor of LPCD, who sued PRASA, LPCD, the Sureties, and others for LPCD's and PRASA's failure to pay for

Soletanche, Inc.'s services rendered in the Project. Exhibit 5-t at 3-4; ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 53:38-54:41. The case currently before the Court, however, involves different parties, as neither Soletanche, Inc. nor PRASA are parties in the federal litigation. Moreover, it is true that the federal case is related to the state case inasmuch as it was filed after the state court found LPCD and the Sureties liable to Soletanche, Inc. for over two million dollars. *Id.* at 69-70. Nevertheless, stating that the cases are parallel because both cases "are about the the [*sic*] bonds for the Project" is an oversimplification of the issues at hand. ECF No. 25 at 4. In the state court case, the issues involve breach of contract and money collection for services rendered, whereas the issues in federal case revolve around a different type of breach of contract, that is, the Indemnitors' failure to comply with their obligations to provide collateral, access to books and records, and indemnification to the Sureties per the terms of the Indemnity Agreements. In sum, because the state and federal proceedings are not parallel, the *Colorado River* abstention doctrine is inapplicable. Consequently, the request for the Court to abstain should be DENIED.

## V.    PRELIMINARY INJUNCTION (ECF NO. 2)

### A.  Applicable Legal Standard

Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). A court may grant a preliminary injunction in order "'to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs.'" *Matos ex rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 72 (1st Cir. 2004) (quoting *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995)). "A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151,

163 (1st Cir. 2004) As such, this remedy is extraordinary in nature and should never be awarded "as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)); *see also People Federal Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) ("A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right.") (quoting *Voice of Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). Thus, "'[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barceló*, 456 U.S. 305, 312 (1982); *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

A district court considering whether to grant a preliminary injunction must weigh four different elements, to wit: "(1) the probability of the movant's success on the merits;" (2) "the prospect of irreparable harm absent the injunction;" (3) "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does);" and (4) "the effect of the court's action on the public interest." *Matos ex rel. Matos*, 367 F.3d at 73 (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991)). The First Circuit has often held that the likelihood of success and irreparable harm factors carry the most weight in this analysis. *See New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters for idle curiosity.") (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)); *Charlesbank Equity Fund II*, 370 F.3d at 162 ("In most cases . . . irreparable

harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.")

(citing *Matos ex rel. Matos*, 367 F.3d at 73).

### B.  Collateralization

#### 1.  Likelihood of Success on the Merits

Plaintiffs in this case contend they have a likelihood of success on the merits because, in addition to Defendants being bound by the terms in the Indemnity Agreements, Puerto Rico law supports "the enforcement of clear and unambiguous provisions of an indemnity agreement between a surety and its indemnitors. . . ." ECF No. 2 at p. 12. Defendants, however, are silent in this regard.

It is uncontested that the terms of the Zurich GAI obligates Defendants to "exonerate, indemnify,[10] and keep indemnified [Sureties]" against any losses or expenses incurred by Indemnitors, and state that "[p]ayment . . . shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor." *See* Exhibit 4 at p. 1, cl. 2. Similarly, the XL GAI states:

> In order to exonerate, hold harmless, and indemnify [Sureties], [the Indemnitors] shall upon demand of [Sureties] deposit funds with [Sureties] before [Sureties] make[] any payment; such funds shall be, at [Sureties'] option, money, or property or liens on or security interests in property. The amount of such money or property or the value of the property to become subject to liens or security interests shall, at the option of the [Sureties], equal (1) the sum of all pending claims asserted against [Sureties] on [bonds], whether, such claims are contested or not or whether or not liability has been established with respect to such claims, plus the amount of costs or expenses which the [Sureties], in [their] sole discretion, estimate[] may be incurred as a result of the assertion of such claims, or (2) the reserve established by [Sureties] as consequence of having issued [bonds] in behalf of [LPCD].

*See* Exhibit 10 at p. 2, cl. V(B).

---

[10] The Zurich GAI and the XL GAI both contain co-surety beneficiary provisions. *See* Exhibit 4 at p. 3, cl. 14; Exhibit 10 at p. 1, cl. II(D).

Thus, Defendants are contractually bound to deposit funds with Plaintiffs as soon as it is demanded. *See* P.R. Laws Ann. tit. 31, § 4916 (1930) ("The surety, even before paying, may proceed against the principal debtor: (1) [w]hen he is sued for the payment. . . ."); *see also* P.R. Laws Ann. tit. 31, § 2994 (1930) ("Obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations.").[11] On June 30, 2023, the Appellate Judgment was entered, and liability asserted against LPCD and the Sureties. Exhibit 5-t. As a result of the judgment in the Soletanche Litigation, Plaintiffs sent Defendants a demand letter on July 1, 2024 (Exhibit 1), requesting they deposit collateral in the amount of five million six hundred thousand dollars ($5,600,000.00) and provide Plaintiffs reasonable access to their books and records, which Defendants answered on August 2, 2024, but did not comply with. Exhibit 2. To this date, Defendants have yet to deposit the requested collateral or access to their books and records, thereby failing to meet the terms of the Indemnity Agreements.[12] With this framework in mind, Plaintiffs will likely succeed in the merits of their claim. Thus, the first prong weighs in their favor.

### 2. Irreparable Harm

Similar to likelihood of success on the merits, irreparable harm is also given much weight when analyzing whether to award preliminary injunctive relief. *Charlesbank Equity Fund II*, 370 F.3d at 162 (citing *Matos ex rel. Matos*, 367 F.3d at 73). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Id.* (citing *Ross-Simons of Warwick, Inc.*, 102 F.3d at 15). This prong of the injunctive relief standard

---

[11] The Puerto Rico Civil Code of 1930 was repealed by the new Puerto Rico Civil Code of 2020, which came into effect on November 28, 2020. However, because the events of this case occurred prior to this date, the applicable Civil Code is the now repealed Puerto Rico Civil Code of 1930. *See Díaz-Morales v. Universidad de Puerto Rico*, Civil No. 20-1630 (RAM), 2023 WL 3177792, at *2 (D.P.R. May 1, 2023) ("It is well established that if the events of a case occurred before the implementation of the newest Civil Code, then the Puerto Rico Civil Code of 1930 should be applied instead.") (citations omitted).
[12] No informative motion has been filed advising the contrary.

requires the movant to show that they are at risk of suffering harm that cannot be remedied through monetary relief. *See Matos ex rel. Matos*, 367 F.3d at 73 ("A preliminary injunction should not issue except to prevent a real threat of harm.") (citing *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19; 11A Charles Alan Wright, Arthur R Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1, at 153-54 (2d ed. 1995)). Given that injunctive relief is extraordinary in nature, the general consensus amongst the circuits, including the First Circuit, when considering the irreparable harm prong is that if the harm can be remedied by money, it is not irreparable. *See Foxboro Co. v. Arabian American Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find irreparable injury where only money is at stake and where the plaintiff has a satisfactory remedy at law to recover the money at issue.") (citing *Itek Corp. v. First Nat'l Bank*, 730 F.2d 19, 22 (1st Cir. 1984)).[13]

Per witness testimony, Plaintiffs here acknowledge that the relief they seek is economic in nature. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 2:43:40-2:44:27. Plaintiffs' position is instead that they are not required to show the existence of irreparable harm because the contractual language of the indemnity clause in the XL GAI is enough,[14] by itself, to satisfy this requirement. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:19:33-3:19:53.[15] Plaintiffs also insist that they are not

---

[13] *See also, e.g., Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) ("'Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a' preliminary injunction 'are not enough.'") (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *Checker-Cab of Philadelphia Inc. v. Uber Techs., Inc.*, 643 F.App'x 229, 232 (3d Cir. 2016) ("[The Third Circuit] has 'long held that an injury measured in solely monetary terms cannot constitute irreparable harm.'") (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009)); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("It is true that economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award.") (citing *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)).

[14] *See* Exhibit 10 at p. 2, cl. V(B) ("[Indemnitors] acknowledge that failure of [Indemnitors] to deposit funds with [Sureties] in accordance with this section in the amounts and at the time demanded by [Sureties] shall cause irreparable harm for which [Sureties] ha[ve] no adequate remedy at law.").

[15] "Our position is that, to the extent that as a condition for the issuance of the bonds, the defendants agreed that they had to sign this agreement, and in this agreement they consented that this situation precisely where we are right now constitutes irreparable harm, that element of the claim of irreparable harm does not have to be proven at this point in the case."

seeking indemnification at this stage of the proceedings, but rather collateralization. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:13:03-3:15:29. To this end, and citing to *Travelers Cas. and Sur. Co. of America v. Indus. Com. Structures, Inc.*, No. 6:12-cv-1994-Orl-28DAB, 2012 WL 4792906, (M.D. Fla. Oct. 9 2012) and to *Philadelphia Indem. Ins. Co. v. Therma Seal Roof Sys., LLC*, 21-80306-CIV-MARRA, 2022 WL 1664183 (S.D. Fla March 9, 2022), Plaintiffs further argue that Defendants' failure to provide collateral would harm them because it would put their security interest at risk and effectively turn them into general unsecured creditors, a risk they did not bargain for. ECF No. 2 at p. 19; ECF No. 58, Evid. Hrg, Aug. 20, 2025, at 3:35-56-3:37:48. In their view, they are only required to demonstrate that Defendants have failed to deposit the requested collateral and this, by the terms of the XL GAI, is enough to constitute irreparable harm. ECF No. 2 at p. 17; ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:13:14-3:13:42, 3:18:04-3:18:20.

Defendants, on the other hand, maintain that Plaintiffs have failed to make a showing of irreparable harm, as is required by the traditional four-prong test, contending that Plaintiffs' alleged irreparable harm is monetary in nature. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 4:06:51-4:07:05. In particular, Defendants argue that a contractual clause such as the one at issue here, alleging irreparable harm, is not enough by itself to meet the preliminary injunction standard; an actual showing of irreparable harm is still required. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:52:33-3:52:43, 4:02:19-4:02:41. Therefore, they posit that the Court should deny injunctive relief, as the Plaintiffs failed to meet the irreparable harm prong of the preliminary injunction standard. *Id*.

The issue at hand boils down to whether a clause in an indemnity contract—wherein the parties agree that failure to abide by the terms of said clause (including collateralization) constitutes irreparable harm and entitles the sureties to injunctive relief for *inter alia* specific

performance—is enough by itself to meet the irreparable harm prong of the preliminary injunction standard. As already stated, when the remedy sought is purely economic in nature, the irreparable harm prong of the preliminary injunction standard is generally not met. *Foxboro Co.*, 805 F.2d at 36. In the same vein, various circuits have rejected the notion that the irreparable harm prong is met or may be satisfied by simply including language to that effect in a contractual agreement. *See e.g.*, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) ("While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award for injunctive relief.") (collecting cases); *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1982) ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); *Smith, Bucklin & Assoc., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("[A] contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, [] by itself is an insufficient prop.") (citation omitted). This notwithstanding, when the contractual agreement involves a surety, the answer is not so cut and dry. There is a lack of consensus as to whether, in the context of sureties, clauses in indemnity agreements with "irreparable harm" language—like the language in the XL GAI—are enough on their own to meet the irreparable harm prong of the preliminary injunction standard, and neither the United States Court of Appeals for the First Circuit nor the United States Supreme Court have yet ruled on this particular issue.

As Plaintiffs contend, some courts find that a surety suffers irreparable harm when an indemnitor fails to provide collateral per the terms of an indemnity agreement that contains such "irreparable harm" language. One is example is *Philadelphia Indem. Co. v. DB Booneville, LLC*, where the court granted the surety's request for preliminary injunction, finding that "[t]he protection provided by a collateral security provision would be impaired if the surety had to suffer even a temporary loss after a principal's failure to perform." 4:24-cv-00029-SMR-WPK, 2024 WL 4016373, at *6 (S.D. Iowa July 12, 2024) (citing *Safeco Ins. Co. of Am. v. Lake Asphalt Paving & Co.*, 807 F.Supp.2d 820, 827 (E.D. Mo. 2011); *Travelers Cas. & Surety Co. v. Ockerland*, No. 04-C-3963, 2004 WL 1794915, at *5 (N.D. Ill. Aug. 6, 2004)). In so finding, the *Philadelphia* court stated that sureties would not only face economic harm but would also be put in a position where they run the risk of becoming general unsecured creditors, thereby losing the security interest they bargained for. *Id.* ("Without specific performance of a collateral-security clause, it becomes a nullity that cannot be adequately remedied through money damages. . . . [T]he purpose of [these] provision[s] (and the benefits derived from its bargain) is that a surety will not have to compete with other unsecured creditors . . . .") (citations omitted) (internal quotations omitted). The court further explained that the very nature of the surety business, and of indemnity contracts, is to prevent being exposed to such a risk. *Id.* ("'[T]he *entire purpose* of a contract is to provide security to a surety in the event of a third party's claim for damages, the lack of security cannot be adequately remedied by a money judgment months or years down the road.'") (quoting *Merch. Bonding Co. (Mutual) v. Arkansas Constr. Sol., LLC*, No. 5:18-CV-05078, 2019 WL 452767, at *5 (W.D. Ark. Feb. 5, 2019) (emphasis in original).

Other courts have also displayed similar reasoning. *See, e.g.*, *XL Specialty Ins. Co. v. Bighorn Constr. & Reclamation, LLC., et al.*, Civil. No. 31-3068-BAH, 2022 WL 2105925, at * 9

(D. Md. June 10, 2022) ("[T]he nature of the injury is not simply monetary, . . . [but rather], the harm amounts instead to the failure . . . to perfect a security interest . . . . In this critical respect, a surety's loss of its right to collateralization cannot be adequately remedied through money damages.") (citations omitted) (internal quotations omitted); *Great Am. Ins. Co. v. SRS, Inc.*, Civil No. 3:11-cv-00970, 2011 WL 6754072, at *8 (M.D. Tenn. Dec. 23, 2011) ("[C]ourts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been asserted against them.") (collecting cases); *XL Specialty Ins. Co. v. Truland*, No. 1:14-cv-1058 (JCC/JFA), 2014 WL 4230388, at *4 (E.D. Va. Aug 21, 2014) ("Absent enforcement of the collateral security obligation, Plaintiffs [sureties] would be in the same position as any other unsecured creditor of the Defendants [indemnitors].") (citing *Int'l Fid. Ins. Co. v. Anchor Env't, Inc.*, No. 07-04750, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008)).

Therefore, the reasoning behind finding that a surety suffers irreparable harm if an indemnitor fails to post collateral lies in the risk it faces of becoming an unsecured creditor in the event that the indemnitor become insolvent. *Truland*, 2014 WL 4230388, at *4. According to this line of cases, this sort of risk to a surety's security interest is not something that may be remedied with monetary relief, thereby making it a harm for which there is no adequate remedy at law. *Bighorn Constr. & Reclamation, LLC., et al.*, 2022 WL 2105925, at * 9. At first glance, these cases seem to support Plaintiffs' request for preliminary injunction insofar as, were Defendants to become insolvent, Plaintiffs run the risk of facing those circumstances as unsecured creditors. However, during the redirect examination of Plaintiffs' witness Allison Sacks (the representative for XLS and XLR), the following exchange ensued:

> Q: You have stated on [*sic*] your testimony that, under the agreement of indemnity, the defendants agreed that the surety would stand to suffer irreparable in the event that the surety faces a potential loss on a claim, correct?
> A: Yes.

> Q: And to question asked by sister counsel here you have stated that that irreparable harm includes a potential economic loss, correct?
> A: Yes.
> Q: Is there anything else that is included as part of the irreparable harm, that the sureties stand to suffer?
> A: I don't believe so.

ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 2:43:40-2:44:27. Although Ms. Sacks states throughout her testimony that Plaintiffs' request for collateralization stems from their desire to become secured creditors,[16] in the end and as the quoted text states, she nonetheless acknowledges that the harm Plaintiffs stand to suffer is economic in nature.

Conversely, the reasoning in *Travelers Cas. & Sur. Co. of America v. W.P. Rowland Constructors Corp.*, No. CV-12-00390-PHX-FJM, 2012 WL 1718630, at *3 (D. Ariz. May 15, 2012) is much better suited to the case at hand.[17] In *W.P. Rowland*, the surety issued the indemnitors two bonds for the indemnitors' construction projects. 2012 WL 1718630, at *1. As part of the general agreement of indemnity signed by the parties to issue those bonds, the indemnitors agreed to deposit collateral with the surety upon the surety's demand. *Id*. The collateral deposit clause in that agreement contained similar irreparable harm language to the one in the XL GAI currently before the Court.[18] In denying the surety's request for a preliminary injunction, the court explained its reasoning as follows:

> [T]o obtain collateralization as preliminary injunctive relief, plaintiff must show that it will likely suffer irreparable harm. *Hudson Ins. Co. v. Simmons Constr., LLC*, CV-12-407-PHX-GMS, 2012 WL 869383, at *3 (D. Ariz. Mar. 14, 2012). Defendants argue that plaintiff has not met its burden. We agree. Plaintiff points to the Agreement's language, arguing that defendants agreed that plaintiff "would suffer irreparable damage and would not have an adequate remedy at law." [. . .]

---

[16] *See, e.g.*, ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 2:38:37-2:38:58, 2:43:39-2:46:28.

[17] See also *Gray Cas. & Sur. Co. v. 3i Contracting, LLC*, Civil No. 3:23-CV-2511-L, 2024 WL 1121800, (N.D. Tex. March 13, 2024), where the court denies injunctive relief despite the language of the indemnity agreement. In so ruling, the court in *Gray Cas. & Sur. Co.* held that it "disagrees that the inclusion of the contractual provision in the Indemnity Agreement . . . relieves Plaintiff of its burden to establish each requirement for a preliminary injunction, or the irreparable harm requirement." *Id.* at *9.

[18] *See W.P. Rowland*, 2012 WL 1718360, at *1 ("The Indemnitors also agreed that plaintiff 'would suffer irreparable damage and would not have an adequate remedy at law' if they failed to comply.").

But this contractual language, without more, does not show a likelihood of irreparable harm. *See Id.* at *4 (fact that surety agreement used term "irreparable harm" did not in itself "support the extraordinary remedy" of a temporary restraining order). Plaintiff has not shown that it is likely to incur any damages other than the economic cost of paying the bond claims prior to receiving collateral. Economic injury alone, however, "does not support a finding irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Center, Inc.*, 944 F.2d at 603. . . . Plaintiff has not shown that extreme or very serious damage will result if the collateral is not provided. It has not, for example, established that it does not possess sufficient funds to pay the bond claims. And it has not shown that the injury sustained by defendants' failure to provide collateral is incapable of being compensated with money damages. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009). Because plaintiff has not shown it is likely to suffer irreparable harm or that a mandatory injunction is warranted, it is not entitled to preliminary injunctive relief requiring defendants to provide collateral security.

*Id.* at *3.

Much like the surety in *W.P. Rowland*, Plaintiffs claim that, per the terms of the indemnity clause, they would suffer irreparable harm if Defendants fail to collateralize them in the amount requested. They have not, however, shown that they are going to suffer any other injury, except for the economic risk of having to tap into their own coffers to pay the Soletanche Litigation judgment amount. Furthermore, even this risk cannot constitute irreparable harm, as Plaintiffs' use of its own funds would not make them insolvent, a fact they admit during cross examination. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 2:52:44-2:53:33.[19] Irreparable harm requires more than just an agreement between the parties to that effect; rather, it requires the movant to *show* the harm is

---

[19] Q: If the sureties were not to recover the collateral from the indemnitors, would it put XL out of business?
. . .
A: It would not put us out of business, but I don't think that's relevant to the contract that was executed between XL, Zurich, and the Indemnitors.
Q: And when you say that it wouldn't put XL out of business, it means that XL would not become insolvent. Is that correct?
A: That's correct.

truly irreparable.[20] Simply put, Plaintiffs' own admissions militate against finding irreparable harm.

Though Puerto Rico law favors enforcing the terms of the contracts executed between the parties,[21] it is no less true that a preliminary injunction is extraordinary in nature and should be granted sparingly.[22] Moreover, Plaintiffs' fear that denying injunctive relief for collateral would essentially nullify the clause of their agreement is not entirely true, as Plaintiffs are not without recourse. It has already been established that Plaintiffs have a strong likelihood of success on the merits of their claim for collateralization. This being the case, nothing precludes them from filing a partial motion for summary judgment (which does not require a showing of irreparable harm) and obtaining collateralization that way, should they prevail in persuading the Court that there are no material facts in controversy.

To this end, as a matter of persuasive and not binding authority, there is precedent in other jurisdictions in which courts have found that sureties filing a motion for summary judgment to enforce a collateral security clause in an indemnity agreement with such irreparable harm language are entitled to specific performance. *Arch Ins. Co. v. Centerplan Constr. Co.*, 386 F.Supp.3d 350 (D. Conn. 2019) and *Great Am. Ins. Co. v. RDA Constr. Corp.*, Civ. No. 13-11593-DJC, 2015 WL 5163043 (D. Mass. Sept. 3, 2015) both present this situation. In granting the surety's partial motion

---

[20] Other cases where sureties seek to enjoin indemnitors for specific performance of their collateral security provisions, though admittedly without the "irreparable harm" language, have echoed this sentiment. *See, e.g., Fireman's Ins. Co. of Newark, N.J. v. Keating*, 753 F.Supp. 1146, 1154 (S.D.N.Y. 1990) ("[I]t is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate."); *Great Am. Ins. Co. v. Fountain Eng'g, Inc.*, No. 15-CIV-10068-JLK, 2015 WL 6395283, at *4 (S.D. Fla. Oct. 22, 2015) ("[T]o imbue fundamentally meaningless contractual language with legal meaning, simply because it is otherwise meaningless, is circular at best. Indeed, the parties to a contract cannot, by including certain language with that contract, create a right to injunctive relief where it would otherwise be inappropriate.") (collecting cases) (internal quotations omitted).

[21] P.R. Laws Ann. tit. 31, §§ 2994, 3471, 3451 (1930).

[22] *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted); *Charlesbank Equity Fund II*, 370 F.3d at 163 ("A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests.").

for summary judgment, the court in *Arch Ins. Co.* explained that "[a] surety must [] be able to recover under specific performance because, as a creditor, it must 'have the security position for which it bargained . . . .'" 386 F.Supp.3d at 383 (quoting *Ohio Cas. Ins. Co. v. Fratarcangelo*, 7 F.Supp.3d 206, 214 (D. Conn. 2014)). The court further elaborated that "[t]he rationale behind granting specific performance in these situations, when the surety is essentially seeking only money damages, is that the surety has specifically bargained for prejudgment collateralization and a judgment for money damages alone would deprive the surety of prejudgment relief to which it is contractually entitled." *Id*.

Similarly, in *RDA Constr. Corp.*, wherein the surety's motion for summary judgment was also granted, the court articulated that "a surety may sue for specific performance for deposit of security to cover the surety's reserve if such a provision is found in the indemnity agreement." 2015 WL 5163043, at *8 (quoting *Employers Ins. of Wausau v. Bond*, No. 90-cv-1139-JRH, 1991 WL 8431, at *3 (D. Md. Jan. 25, 1991)). It reiterated that "'[c]ollateral security clauses have routinely been upheld' and '[i]f a creditor is to have the security position for which he bargained, the promise to maintain the security must be specifically enforced.'" *Id*. (quoting *I.S. Fid. & Guar. Co. v. Feibus*, 15 F.Supp.2d 579, 588 (M.D. Pa. 1998); *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984)).[23] Thus, as these cases show, a surety seeking specific performance of collateralization per the terms of the indemnity agreement at the summary judgment stage, with the proper uncontested material evidence, could have its bargained-for right upheld.[24]

---

[23] Another example of this is *Am. Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293 (2d Cir. 1989), where the surety (AMICO) sued the indemnitor (United) seeking indemnification and collateral security under the indemnity agreement signed by the parties, though it did not contain irreparable harm language. United filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on ripeness grounds, which the district court granted, and AMICO filed a cross-motion for summary judgment, which the district court denied. *Id*. at 294. The Second Circuit, in reversing the district court's decision, found the case was ripe for review and that, under the indemnity agreement signed by the parties, AMICO was entitled to collateral security. *Id*. at 302.

[24] *See also U.S. Fidelity and Guar. Co. v. Díaz-Matos*, Civil No. 05-1851 (PG), 2007 WL 878571, at *7 (D.P.R. March 21, 2007) (Despite denying the request for injunctive relief, which involved an agreement that did not contain the

In sum, considering the persuasive authority on both ends of the legal query outlined above, a surety cannot rely solely on the "irreparable harm" language in its indemnity agreement to avoid making a showing to that effect. *See Fountain Eng'g, Inc.*, 2015 WL 6395283, at *4 ("Indeed, the parties to a contract cannot, by including certain language in the contract, create a right to injunctive relief where it would otherwise be inappropriate. . . . It would represent an extraordinary variance from this basic principle for a court to recognize that the parties to a suit at equity have contracted around one of the fundamental elements.") (quotations omitted) (citations omitted). As already stated, harm that can be remedied by monetary relief, with nothing more, is not irreparable. Thus, having relied solely on the "irreparable harm" language of the XL GAI to support their argument for this prong, ECF No. 2 at p. 17; ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:13:14-3:13:42, 3:18:04-3:18:20, Plaintiffs have failed to show their will suffer irreparable harm. Based on the foregoing analysis, the irreparable harm prong weighs against them.

### 3. Balance of the Equities

In analyzing this third prong of the preliminary injunction standard, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1982). Plaintiffs' argument is that this prong is inapplicable because, per the terms of the Indemnity Agreements, the Sureties should not be made to suffer any hardship whatsoever. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:20:36-3:24:26. They maintain that "there is no balancing act [here] to be done, [but rather] it's [an issue of] compliance with the terms of the agreement signed by the parties." ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:23:59-3:24:05; ECF No. 2 at p. 22. As to the hardship the Defendants would suffer, Plaintiffs state they would

---

irreparable harm clause, the court ultimately granted partial summary judgment in favor of the surety, finding that the surety showed it was entitled to specific performance of collateral.).

likewise suffer no hardship because by signing the Indemnity Agreements "they agreed to provide and post the collateral . . . ." ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:24:26-3:24:42.

However, the burden is on Plaintiffs to show that it will suffer a greater hardship than the Defendants. *See Esso Standard Oil (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 ("The party seeking the preliminary injunction bears the burden of establishing that the[] four factors weigh in its favor.") (citing *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). They have not done so. Rather, they say this prong does not even apply because it was contractually agreed to that they would be entitled to injunctive relief. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:24:26-3:24:42; Exhibit 10 at p. 2, cl. V(B). Yet, Plaintiffs have already acknowledged that their harm is monetary in nature, and that they would not become insolvent if collateral is not deposited. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 2:52:44-2:53:33.

As for Defendants, neither they nor Plaintiffs have presented any evidence that shows whether Defendants would suffer harm, such as insolvency. One should not overlook the fact that three of the Defendants—EBI, PEI, and CRP—have been dissolved since 2019, a fact that Defendants knew approximately three months before the evidentiary hearing but neglected to tell Plaintiffs about until the eve of the evidentiary hearing. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:34:28-3:34:38, 3:41:50-3:41:57, 3:42:33-3:42:50. However, the reason behind the dissolution of these entities is unknown, and it would be unwise to speculate. Hence, given that neither side has brought forth convincing evidence one way or another as to this prong, the race in this regard is inconclusive at best.

### 4. Public Interest

Plaintiffs' position is that the public interest favors "the enforcement of contracts according to the intent of the parties, [as it] is an essential function of courts of justice." ECF No. 2 at 22; *see*

*also* ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:13:15-3:13:44 ("[W]hen parties sign an agreement, there is a public policy under Puerto Rico law that parties need to abide by the four corners of the agreement they sign. . . .").[25] Defendants, once again, are silent on this front. As previously stated, the Puerto Rico Civil Code of 1930 states that "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." P.R. Laws Ann. tit. 31, § 2994 (1930). It also states that "[c]ontracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist." P.R. Laws Ann. tit. 31, § 3451 (1930).

In this regard, the Supreme Court of Puerto Rico has explained that "'[t]he courts of justice cannot release a party from complying with what it bound itself to do by contract when said contract is legal and valid and has no defect whatsoever." *Cevercería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 351, 15 P.R. Offic. Trans. 455, 463 (1984) (quoting *Olazábal v. US Fidelity, etc.*, 103 D.P.R. 448, 462 (1975)); *see also Selosse v. Fund. Educ. Ana G. Méndez*, 122 D.P.R. 534, 549, 22 P.R. Offic. Trans. 498, 514 (1988) (citing *Cevercería Corona*, 115 D.P.R. at 351; *López de Victoria v. Rodríguez*, 113 D.P.R. 265 (1982); *Olazábal*, 130 D.P.R. at 488; *Matricardi v. Peñagarícano, Adm'r*, 94 P.R.R. 1, 4 (1967)). Thus, as Plaintiffs point out, the public interest factor weighs in their favor.

In sum, Plaintiffs have failed to meet the "irreparable harm" prong of the preliminary injunction standard. Considering the irreparable harm prong constitutes a *sine qua non* requirement for granting injunctive relief, Plaintiffs' request for specific performance of collateralization should be DENIED.

---

[25]  *See also* ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:20:17-3:20:36 ("There is a strong public interest for parties who sign agreements to meet the obligations that they agreed to when they signed the agreement. That is well established under Puerto Rico law.").

### C. The Books and Records Provisions

#### 1. Likelihood of Success on the Merits

Plaintiffs claim that the Indemnity Agreements "clearly and unequivocally provide that the Sureties have the right to reasonable access to the Indemnitor's books, records, and accounts." ECF No. 2 at p. 16. Citing to Puerto Rico law upholding the enforcement of contracts when their terms are clear and unambiguous, as well as persuasive authority wherein other districts granted such access, Plaintiffs argue that the clear terms of the Indemnity Agreements to which Defendants bound themselves should be honored, and access to books and records be granted. *Id.* at pp. 12-16. Defendants are silent as to Plaintiffs' likelihood of success on the merits in this regard.

As Plaintiffs contend, Puerto Rico law categorically supports the enforcement of contractual agreements between the parties when the terms are clear and unambiguous. *See* P.R. Laws Ann. tit. 31, § 3451 ("Contracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist."); P.R. Laws Ann. tit. 31, § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail."). To this end, it is uncontested that both of the Indemnity Agreements contain provisions that clearly state Defendants are obliged to provide Plaintiffs with reasonable access to their books and records (the "Books and Records clauses"). Specifically, the Zurich GAI states:

> NINTH: At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Contractor, and Indemnitors; and any bank, depository, materialman, supply house, or other person, firm, or corporation

when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.

Exhibit 4 at p. 3, cl. 9. By the same token, the XL GAI provides:

(A) At any time during business hours and until such time as the liability of SURETY under BOND(S) is terminated and SURETY is fully reimbursed for all of its losses, costs and expenses as a result of having executed, provided or procured BOND(S) on behalf of PRINCIPAL, SURETY shall have access to the books, records, software, data bases, computer stored information, contract documents, drawings, and accounts of UNDERSIGNED, wherever located, for the purpose of inspection, copying and reproduction.

(B) UNDERSIGNED authorize SURETY or its designee to investigate the financial condition of UNDERSIGNED, the status of work under contracts being performed by UNDERSIGNED, the condition of the performance of such contracts, the status of payment of accounts of UNDERSIGNED and all other matters, deemed appropriate by SURETY for the purpose of determining whether or not to execute BOND(S) on PRINCIPAL'S behalf or in investigating claims made against BOND(S) or in investigating SURETY'S exposure to loss generally. When requested by SURETY, banks, depositories, accountants, attorneys, obligees on BOND(S), architects, materialmen, subcontractors, supply houses, prior and subsequent sureties, joint venture(s), and other PERSON(S) are hereby authorized by UNDERSIGNED to furnish SURETY any information requested with respect to UNDERSIGNED. SURETY shall have no liability for receipt or disclosure of any information respecting UNDERSIGNED which is obtained or utilized pursuant hereto.

Exhibit 10 at p. 4, cl. XVI. Once the Soletanche Litigation resulted in liability against LPCD and the Sureties,[26] Plaintiffs demanded that Defendants provide *inter alia* reasonable access to their books and records so that they may assess the financial situation of the Defendants, as per the terms of the Books and Records clauses. Exhibit 1. Defendants, to date, have not provided such access. Considering these facts and the applicable Puerto Rico law provisions, Plaintiffs have a likelihood of success on the merits of their request to access Defendants' books and records. Thus, this prong weighs in Plaintiffs' favor.

---

[26] *See* Exhibit 5-t.

## 2. Irreparable Harm

Unlike their collateralization argument, Plaintiffs admit that they must show irreparable harm exists if they do not obtain access to Defendants' books and records. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:31:45-3:32:28. To this end, Plaintiffs argue that irreparable harm exists because, by not knowing Defendants' financial situation, they are unaware of whether Defendants are or may become insolvent. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:32:29-3:33:25.[27] They, thus, run the risk of becoming general unsecured creditors were Defendants to file for bankruptcy, a harm that has no adequate remedy at law. *Id*. To highlight this fact, they point to the dissolution of defendants EBI, PEI, and CRP, which Defendants did not mention until the day before the evidentiary hearing. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:34:28-3:34:38, 3:41:50-3:41:57, 3:42:33-3:42:50; Exhibits A, B, and C. Plaintiffs further argue that because the interest continues accruing in the Soletanche Litigation, the liability they face in state court may be more than the loss reserve they currently have. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:33:25-3:35:39.

Defendants, on the other hand, provide little in the way of opposition. Their general position throughout the hearing remains that Plaintiffs have not suffered irreparable harm and that the existence of an agreement does not mean that they have the right to injunctive relief. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:52:33-3:52:43 ("Our defense in the context of this hearing is

---

[27] Q: And what evidence have I heard here today that failure to give access to the books and records would rise to the level of irreparable harm?
A: Well, again, we go back to the four corners of the agreement between the parties. If no access to books and records have [*sic*] been granted, as has been the case, the sureties have the uncertainty of not knowing what is the financial condition of the indemnitors and whether they can comply or meet the obligations under the state court judgment. That puts the surety in the position of: if it has to pay for that claim and tomorrow LPC&D files for bankruptcy, they become general unsecured creditor[s], which is not . . . the bargain that they agreed to with the agreement of indemnity, and that constitutes irreparable harm.

that there is no irreparable damage whatsoever, and the mechanism selected by the plaintiffs is incorrect, according to the law."); *Id*. at 4:02:19-4:02:41 ("[O]ur position is: simply because there is an argument does not mean that they are suffering irreparable harm and that they have a right to injunctive relief. There is no caselaw in Puerto Rico that establishes that that type of contractual agreement has been permitted or that is has been recognized in our jurisdiction."). [28]

As a general rule, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II*, 370 F.3d at 162 (citing *Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.)*, 862 F.2d 869, 902 (1st Cir. 1988)). "Irreparable harm most often exists where a party has no adequate remedy at law." *Id*. (citing *Rosario-Urdaz v. Rivera-Hernández*, 350 F.3d 219, 221 (1st Cir. 2003)). In this regard, Plaintiffs once again fail to meet this threshold prong.

First, the "irreparable harm" language in the XL GAI does not cover access to books and records, only collateralization. Exhibit 10 at p. 2, cl. V(B). Second, their argument for access to Defendants' books and records is similar to their argument for collateralization. Having provided no reason other than the risks of becoming unsecured creditors and having to use their own coin to pay for the Appellate Judgment, Plaintiffs have not shown that failure to access Defendants'

---

[28] During the hearing, Defendants inquired about the fact that PRASA deposited a four million three hundred thousand-dollar ($4,300,000.00) retainage amount in the state court for its liability in the Soletanche Litigation, which Plaintiffs did not consider during the calculations for their loss reserve. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 1:40:39-1:41:58. Defendants attempted to argue that Plaintiffs should have considered this deposit when calculating their reserves as it would impact the exposure risk Plaintiffs are facing. 3:45:46-3:46:17, 3:46:40-3:47:25. However, Defendants failed to explain why the retainage amount PRASA deposited to cover its liability in the Soletanche Litigation should have been considered by Plaintiffs when calculating their exposure risk, when the Appellate Judgment clearly separates the liability amount PRASA faces from the liability amount LPCD and the Sureties face. Exhibit 5-t at p. 69. In fact, neither party elaborated this point during the hearing, nor have they provided information, written or otherwise, of the impact, if any, it has on Plaintiffs' exposure risk. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:47:31-3:47:46, 3:47:55-3:48:02, 3:48:55-3:49:09. With this limited information, a determination cannot be made in this regard.

books and records is anything other than economic in nature. Third, Plaintiffs' can request and obtain access to Defendants' books and records during the normal course of discovery. *See First Nat. Ins. Co. of America v. Sappah Bros., Inc.*, 771 F.Supp.2d 569, 575 (E.D.N.C. 2011) (denying access to defendants' books and records because plaintiff did not make a clear showing that it would suffer "irreparable harm if it is not allowed to immediately inspect the records rather than at some later date, such as in the normal course of discovery.").[29] Fourth, though Defendants' failure to notify Plaintiffs of the three dissolved companies until the eve of the hearing is unjustified, the fact of the matter is that it has been approximately six years since EBI and PEI were dissolved, and almost nine years since CRP was dissolved. Exhibits A, B, and C. Plaintiffs have presented no evidence that the remaining Defendants are suffering or will soon suffer financial instability. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:43:14-3:43:23. For these reasons, the irreparable harm prong weighs against Plaintiffs.

### 3.  Balance of the Equities

Plaintiffs' argument as to this prong is much the same as its irreparable harm argument. That is, they proffer that access Defendants' books and records constitutes irreparable harm insofar as the risk of becoming general unsecured creditors, if Defendants were to become insolvent, is not something that could be remedied through money damages. Defendants, on the other hand, make no argument as to how the access to books and records would constitute undue hardship. When asked during the evidentiary hearing why they have not complied with the Books and Records clauses, Defendants could not provide a clear answer. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:58:02-3:58:55. That is, they did not furnish any reason as to why it would be a hardship

---

[29] *But cf. Travelers Cas. & Sur. Co. of Am. v Padron*, No. 5:15-CV-200-DAE, 2015 WL 1981563, at *7 (W.D. Tex. May 1, 2015) (denying collateralization but granting the surety access to the indemnitors' books and records based on a combined analysis of the irreparable harm and balance of the equities prongs, whereby the court found indemnitors failed to argue that such access causes them irreparable harm).

for them to provide this access. However, they affirm that they remain financially solvent and capable of paying the state court judgment amount. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:43:14-3:43:23. Despite arguing that they had made Plaintiffs offers to provide access to their books and records, Defendants admitted that such offers were contingent upon various conditions which are unknown and which they could not elaborate on. ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 4:07:51-4:08:49. Further, Defendants' failed to promptly notify Plaintiffs of the three dissolved companies until the eleventh hour of the hearing.[30] Hence, this prong tilts towards Plaintiffs' favor.

### 4. Public Interest

As was explained when analyzing this prong as to Plaintiffs' collateralization request, Puerto Rico law has a strong public policy favoring the enforcement of contracts. P.R. Laws Ann. tit. 31, §§ 2994, 3451, and 3471 (1930). This public policy has routinely been upheld by the Supreme Court of Puerto Rico. *See Cervecería Corona*, 115 D.P.R. at 351, 15 P.R. Offic. Trans. at 463; *Selosse*, 122 D.P.R. at 549, 22 P.R. Offic. Trans. at 514. Plaintiffs highlight this point both in their motion and during the evidentiary hearing. ECF No. 2 at 22; ECF No. 58, Evid. Hrg., Aug. 20, 2025, at 3:13:15-3:13:44; 3:20:17-3:20:36. Defendants do not refute Plaintiffs' position in this regard. Therefore, the public interest weighs in Plaintiffs' favor.

In sum, as to their request for access to Defendants' books and records, Plaintiffs have met the likelihood of success, balance of the equities, and public interest prongs of the preliminary injunction analysis. However, Plaintiffs have not met the irreparable harm prong, which is a threshold requirement to grant injunctive relief. Accordingly, Plaintiffs' request that Defendants

---

[30] Exhibits A, B, and C.

be compelled to provide them with access to Defendants' books and records should also be DENIED, as it is something that can be dealt with during the discovery phase.

## VI.  CONCLUSION

For the aforementioned reasons, it is recommended that Plaintiffs' motion to compel (ECF No. 2) be DENIED. It is also recommended that both Defendants' request that the Court abstain under *Colorado River* (ECF Nos. 25 and 26), as well as their motion to dismiss on Rule 12(b)(1) grounds (ECF No. 48) be DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the Court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 12th day of December, 2025.

s/Marcos E. López
U.S. Magistrate Judge